## Luzerne-Graham Min. Corp. v. Tanner et al.

March 2, 1951.

Rehearing Denied May 11, 1951.

A. J. Bratcher, Judge.

Duncan, Humphrey, Peabody & Oldham, Andrew W. Duncan, and Jarvis & Ross for appellant.

Fox & Gordon, B. N. Gordon and Laurence Gordon for appellee.

JUDGE LATIMER—Affirming.

The sole issue is whether or not there is sufficient evidence of probative value to support the Workman's Compensation Board in its finding that the death of James Tanner resulted from the injuries he received while employed by appellant.

James Tanner, a man 59 years of age, had been employed and worked in coal mines from the time he was 14 years of age. The Company operated what is known as a shuttle car in its mine. This car is made of iron or steel and weighs several tons. It was equipped with rubber tires and was operated in the mine somewhat like an automobile.

Tanner had left the place in the mine where he had been working and was approaching a point where the men assembled their tools to be placed in the car for the purpose of transporting them outside. This point was something like a mile from the main opening. This shuttle car was passing through at this time and James Tanner was caught between the side of the car and the rib of the coal, and it rolled Tanner between the side of the car and the rib of the coal for a distance of about 12 or 15 feet. It appears there was a slight depression in the rib of coal and when this point was reached and the pressure released, Tanner fell to the ground seriously injured. He was immediately taken to the hospital where he remained for 21 days under the care of Dr. G. L. Simpson, apparently the company doctor.

In testifying about his injury, Dr. Simpson said, "Well his injuries were confined primarily to the upper trunk of the left, and the significant finding, consisted of a fracture of the left shoulder blade, the left collar bone and a compressed fracture of the eight thoracic spine—that is the vertebra, the eighth."

On October 28, 1947 Tanner was taken from the hospital to his home. On December 26th, he was taken to Louisville in an ambulance and while there the cast, he had worn home from the hospital, was replaced by a brace made of metal and straps. He returned home the same day. A few days after the brace was put on, Mr. Tanner was able to walk around some by use of a cane.

Dr. Simpson states, "He was making a normal recovery from his injury."

On February 26th between one and two o'clock in the morning he commenced hemorrhaging much blood from his mouth and died in a few minutes.

The appellant takes the position that this hemorrhaging had no casual connection with the injury. Appellee takes the converse view. The Board held for the claimant, widow of the deceased, and gave her the full death amount plus funeral expenses. The Muhlenberg Circuit Court upheld the award of the Workman's Compensation Board.

Appellant directs attention to this statement of the Workman's Compensation Board in its opinion and award: "From the evidence it is impossible to tell what brought about the hemorrhaging which caused Mr. Tanner's death." It is insisted that the above statement constitutes a factual conclusion which is entirely inconsistent with the finding that the hemorrhaging had a causal connection with the injury. It is argued that inability to ascertain the cause of the hemorrhage throws the matter into the realm of entire speculation. However, attention might be called to the remainder of the paragraph above which reads: "It is shown conclusively that the deceased was in good health and performed work which required an able-bodied man. It is also shown by Dr. Simpson's evidence that the deceased did not have diseased lungs. While it apparently was never brought to the attention of the doctor, it is shown by undisputed evidence here that Tanner did bleed from the mouth from the day of the injury and had never done so before the injury. It would not take a medical man to know that when Tanner was injured, there was some injury produced in his body which caused this bleeding and later a fatal hemorrhaging. Even though the doctor did not discover this condition or afterward know what it was, there is no doubt that it existed, was a result of the injury, and brought about Tanner's death."

There are two or three principal contentions advanced by appellant that must be considered. Dr. Simpson was rather positive in his statement that he did not know what caused the hemorrhaging and that he could not know without a post mortem examination. It appears that in the earlier developments of the case it was agreed that the question of the cause of the hemorrhaging would be submitted for arbitration to three doctors, Dr. Gaither selected by claimant, Dr. G. L. Simpson selected by appellant and Dr. J. P. Walton

selected by the two named doctors. It was agreed in substance that if these three doctors decided that the accident did not in any way cause the hemorrhage, then Mrs. Tanner would make no further claim. On the other hand if they should decide that the accident was the cause of the hemorrhage, then the mining company was to pay in accordance with that finding. The doctors then took the matter under consideration and came to this conclusion, "After thorough consideration, this group of physicians unanimously felt that without a post mortem examination of the body, there would be no way of determining the cause of death and whether or not it was in any way connected with the mine injury * * *." Mrs. Tanner declined permission for the post mortem.

While frankly admitting that she had a right to refuse; that it was entirely a personal matter with her; and should in no way reflect upon her, appellant seriously contends that it was she who closed the door to an ascertainment of the truth and thus left the cause of the hemorrhage in the field of speculation.

The other element of contention is based around the evidence as to bleeding during the period of hospitalization and afterwards up to the time of the death of Tanner. Appellee objected seriously to Dr. Simpson's use of the hospital record in his testimony relative to this question. Dr. Simpson said that he knew nothing of or heard nothing of any spitting of blood; that the records in the hospital did not show the presence of any spitting of blood; and further stated that if there had been such, it would have been of such significance that the attending nurse would have indicated same on the chart. Appellee objected to the introduction of the chart as testimony because Dr. Simpson did not make the chart. The nurse who made the chart was not introduced. Dr. Simpson states that the first he had heard of any spitting of blood was possibly a week before proof was taken in the matter. However, Mrs. Tanner and numerous others, some closely and some more distantly related to the Tanners, state that on numerous occasions, both at the hospital and while at home, Mr. Tanner would spit up blood and complained of constant pain in his left lung or side.

The weight of the evidence is that he was a well

and able-bodied man, who worked continuously through many years with a minimum apparent illness.

To require claimant to disprove numerous theories as to possible causes for the hemorrhage would be burdening her too greatly. The evidence substantially shows: that there was a serious injury to the deceased Tanner; that he was confined in the hospital for 21 days immediately following the injury; that he was taken to the hospital in Louisville and there placed in metal brace; that there was a continuous spitting up of blood, although this was disputed and contradicted in a negative way; that Tanner complained of continuing pain in left lung; that he was an able-bodied man who worked continuously for many years prior to this injury. The above facts fit into and show a continuing something directly connected with the injury. We conclude it to be such evidence of substance as to support the findings of the Board.

The judgment is affirmed.